1   Janette Wipper (SBN 275264)
    Felicia Medina (SBN 255804)
2   **SANFORD HEISLER, LLP**
    555 Montgomery Street, Suite 1206
3   San Francisco, CA 94111
    (415) 795-2020 (main)
4   (415) 795-2021 (fax)
    jwipper@sanfordheisler.com
5   fmedina@sanfordheisler.com
6
7   *Attorneys for the Plaintiffs and the Class*

8                   UNITED STATES DISTRICT COURT
9                   NORTHERN DISTRICT OF CALIFORNIA

10  SARA WELLENS, KELLY JENSEN,          )
    JACQUELINE PENA, BERNICE             )   C 13    0581
11  GIOVANNI, LARA HOLLINGER,            )
12  and JENNIFER BENNIE                  )
    on behalf of themselves and all others )
13  similarly situated,                  )   **CLASS AND COLLECTIVE**
                                         )   **ACTION COMPLAINT**
14                  PLAINTIFFS,          )
                                         )
15  v.                                   )   **JURY TRIAL DEMANDED**
                                         )
16  DAIICHI SANKYO, INC.                 )
                                         )
17                                       )
                                         )
18                  DEFENDANT.           )
19

20       Plaintiffs Sara Wellens, Kelly Jensen, Jacqueline Pena, Bernice Giovanni, Lara

21  Hollinger, and Jennifer Bennie ("Plaintiffs" or "Class Representatives"), by and through

22  their attorneys, Sanford Heisler, LLP, bring this action in their individual capacities, and

23  on behalf of the class of women defined below, against Defendant Daiichi Sankyo, Inc. to

24  redress gender discrimination in employment.  Plaintiffs allege upon knowledge as to

25  themselves and otherwise upon information and belief as follows:

26  //
27  //
28  //

                                                                              1
    Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

# INTRODUCTION

1.     Defendant Daiichi Sankyo, Inc. ("Daiichi Sankyo," "Daiichi," the "Company," or "Defendant") manufactures and sells cardiovascular, diabetes, and metastatic melanoma therapies and pharmaceuticals. Daiichi Sankyo's parent company – Daiichi Sankyo Company, Ltd. – is a Japan-based pharmaceutical drug giant that serves over fifty-five countries and employs over thirty thousand workers worldwide. Approximately, three thousand of those employees work for the Company in the United States.

2.     Daiichi Sankyo reaps multi-billion dollar profits by relying upon a predominantly female sales force to promote its pharmaceutical drugs to health care providers and institutions across the United States. Instead of employing a business plan designed to reward the talents of female sales employees and advance their careers, Daiichi treats them largely as props in a sales and marketing strategy. Like dinners, sports outings, and speaking fees, female sales reps are considered one of many variations on the inducements that the pharmaceutical company dangles to sway doctors to its brand. Daiichi asks its female sales reps to wine and dine male doctors; offer friendships and gifts to foster "quid pro quo" relationships; and devote unbounded attention to obtain their allegiance to Daiichi's drugs. When female sales reps seek well-deserved career advancement or decide to have children, their role in a sales strategy built upon gender stereotypes becomes even more evident. Essentially, the Company deems its female sales employees unworthy to stand on equal footing with their male counterparts.

3.     Daiichi Sankyo's glass ceiling is indisputable. While female employees dominate rank-and-file sales positions, male employees control **all** tiers of management from the manager-level to the director-level to the officer-level and above.   There are **no women** at the top executive level. Men also reign supreme at Daiichi Sankyo's parent company, which has publicly acknowledged that the "Board of Directors and Board of Kansayaku [its statutory auditors] do not currently have any female members."

Case No. _____    -- CLASS AND COLLECTIVE ACTION COMPLAINT

4.     Daiichi Sankyo's predominantly male sales leadership team maintains control over virtually all aspects of the sales force's employment, including, but not limited to, pay, promotion, and termination decisions. Without a seat at the table, female employees have not fared well in these decisions.

5.     Daiichi Sankyo has systemically paid female sales employees less than similarly situated male sales employees. The Company has also denied female sales employees access to leadership positions across the Company, among other discriminatory acts.

6.     Female sales employees who are pregnant, take maternity leave, or avail themselves of the Company's flexible work schedule policy – which permits employees to work part-time to care for their newborn children, purportedly without fear of career repercussions – are particularly vulnerable at Daiichi Sankyo. Undeniably, pregnant women and working mothers with young children do not fit within the stereotypical role promoted by Daiichi's sales and marketing strategy.

7.     Women are actively discouraged from having children while working at Daiichi Sankyo. Female sales employees of childbearing age have been cautioned against committing "career suicide" if they decide to become pregnant, take maternity leave, or seek part-time work schedules at Daiichi. Women who have been pregnant while working at Daiichi Sankyo have been faced with situations where they were called "baby-makers;" forced to attend work meetings in smoke-filled bars while pregnant; subjected to suspect compensation "offsets" after returning from maternity leave; discouraged from breastfeeding; and "managed out" or demoted for complaining about gender discrimination or for becoming pregnant.

8.     Recently, the Company publicly acknowledged its disregard for working mothers. It announced that it has "shifted [its] focus from actively supporting *women*'s work-life balance" to other (illusory) career development programs. In other words, by the Company's own admission and despite its predominantly female sales force, Daiichi no longer supports work-life balance for women even on paper.

9. Daiichi Sankyo's male sales leadership team and Human Resources ("HR") department have long been on notice that a vast disconnect exists between the gender-equal, diverse, and family-friendly culture Daiichi Sankyo claims to possess and the dismal reality for hundreds of female sales employees who have been underpaid, under-promoted, and/or terminated because of their gender or caregiver status. Nevertheless, the Company has failed to take appropriate remedial measures.

10. The Company's discriminatory policies and practices span the gamut of prohibited acts, which read like an employment discrimination primer on how a company should **not** operate or treat female employees. To remedy the gender discrimination they witnessed and experienced at Daiichi Sankyo, the Class Representatives and the class are seeking all legal and equitable relief available under state and federal anti-discrimination/equal pay/retaliation statutes, including Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e) *et seq.,* as amended; the Equal Pay Act of 1963, 29 U.S.C. Section 201, *et seq.*; the California Fair Employment and Housing Act, Cal. Gov't Code Section 12940, *et seq.*; the California Equal Pay Act, Cal. Lab. Code Section 1197.5, and the California Unfair Business Practices Act, Cal. Bus. and Prof. Code Section 17200, *et seq.* Notably, Plaintiffs seek much needed injunctive relief to rectify Daiichi Sankyo's discriminatory employment policies and practices and ensure that going forward the Company abides by the law.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. Section 1331; Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section 2000(e)-5(f), *et seq.*, as amended ("Title VII"); the Equal Pay Act, 29 U.S.C. Section 201, *et seq.* ("EPA"); and the Family and Medical Leave Act of 1993, 29 U.S.C. Section 2601, *et seq.* ("FMLA"). This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. Section 1367.

12. Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b) and 42 U.S.C. Section 2000e-5(f)(3) because Defendant conducts substantial business in the

4

1 | Northern District of California and because unlawful employment practices were
2 | committed in this District.

3 |     13.    Plaintiffs have standing to bring this suit as Plaintiff Jacqueline Pena has
4 | duly filed individual and class charges of discrimination with the California Department
5 | of Fair Employment and Housing ("DFEH") and the U.S. Equal Employment
6 | Opportunity Commission ("EEOC").

7 | **THE PARTIES**

8 |     14.    **Plaintiff Sara Wellens** ("Ms. Wellens") is a woman who, at all times
9 | relevant to this action, lived and worked in Northern California. Ms. Wellens, a current
10 | employee of Daiichi Sankyo, began working for the Company in September 2009. At
11 | present, Ms. Wellens is a Primary Care Sales Representative III/Sales Specialist in the
12 | Pacific Northwest Region.

13 |     15.    **Plaintiff Kelly Jensen** ("Ms. Jensen") is a woman who, at all times
14 | relevant to this action, lived and worked in Southern California. Ms. Jensen, a current
15 | employee of Daiichi Sankyo, began working for the Company in August 2008. At
16 | present, Ms. Jensen is a Primary Care Sales Representative III in the Southern California
17 | Region.

18 |     16.    **Plaintiff Jacqueline Pena** ("Ms. Pena") is a woman who, at all times
19 | relevant to this action, lived and worked in Southern California. Ms. Pena worked for
20 | Daiichi Sankyo from May 2006 through November 2012, when the Company terminated
21 | her employment. Daiichi Sankyo terminated Ms. Pena because of her
22 | pregnancy/caregiver status, and in retaliation for her engaging in protected conduct,
23 | including taking family and/or disability leave, as well as complaining about
24 | gender/pregnancy discrimination to Daiichi Sankyo's HR department, the EEOC, and the
25 | DFEH. At the time of her termination, Ms. Pena was a Senior Cardiovascular Sales
26 | Representative in the Cardiovascular West Region.

27 |     17.    **Plaintiff Bernice Giovanni** ("Ms. Giovanni") is a woman who, at all
28 | times relevant to this action, lived and worked in Northern California. Ms. Giovanni

1 worked for Daiichi Sankyo from August 2009 through March 2012, when she was forced
2 to resign due to the discrimination she experienced. At the time of her resignation, Ms.
3 Giovanni was a Primary Care Sales Representative I in the Pacific Northwest Region.

4     18.    **Plaintiff Lara Hollinger** ("Ms. Hollinger") is a woman who, at all times
5 relevant to this action, lived and worked in Northern California. Ms. Hollinger worked
6 for Daiichi Sankyo from August 2008 to August 2012, when she was forced to resign due
7 to the discrimination she experienced. At the time of her resignation, Ms. Hollinger was
8 a Primary Care District Manager in the Pacific Northwest Region.

9     19.    **Plaintiff Jennifer Bennie** ("Ms. Bennie") is a woman who, at all times
10 relevant to this action, lived and worked in Southern California. Ms. Bennie worked for
11 Daiichi Sankyo from October 2006 to March 2012, when she was forced to resign due to
12 the discrimination she experienced. At the time of her resignation, Ms. Bennie was a
13 Cardiovascular Sales Representative II in the Cardiovascular West Region.

14     20.    **Defendant Daiichi Sankyo, Inc.** is a pharmaceutical company that
15 conducts substantial business in California and employs personnel in California. The
16 Company is based in Parsippany, New Jersey and is incorporated under the laws of the
17 state of Delaware. In 2010, the Company reported sales of more than $2.6 billion in
18 North America and employed approximately 3,000 people nationwide.

19 **FACTUAL ALLEGATIONS**

20     **A.**    **PLAINTIFF SARA WELLENS**

21     21.    Ms. Wellens is currently a Primary Care Sales Representative III/Sales
22 Specialist in Daiichi Sankyo's Pacific Northwest Region. The Company first hired Ms.
23 Wellens in September 2009. Prior to joining the Company, Ms. Wellens had three years
24 of sales representative experience.

25     22.    During her tenure with Daiichi Sankyo, Ms. Wellens has consistently
26 achieved superior results in sales and distinguished herself as a top performer at the
27 Company. She has won multiple district sales awards. In 2010, Ms. Wellens was ranked
28 9th out of approximately 500 Primary Care 3 sales representatives in terms of sales

6

growth in the West region. Ms. Wellens is currently ranked in the upper 30 percentile of approximately 2,500 Primary Care sales representatives in the nation.

23. As detailed herein, despite Ms. Wellens' exemplary performance, the Company has systematically discriminated against her because of her gender and caregiver status.

### Pay, Promotion, and Pregnancy Discrimination

24. Upon information and belief, Daiichi Sankyo assigned Ms. Wellens during her initial hire to a lower level position, compensation band, and/or tier than similarly situated male employees. Notably, Ms. Wellens' starting salary was $66,000, which was well under market given Ms. Wellens' experience, title, and responsibilities.

25. Ms. Wellens has also received lower merit increases, bonuses, and other compensation perks than comparably situated male sales representatives.

26. Daiichi Sankyo also discriminated against Ms. Wellens by promoting (also internally referred to as "tiering") lesser qualified male employees more rapidly than her. For example, the Company fast-tracked a lower performing male sales representative on Ms. Wellens' sales team to a Sales Representative III position, but stalled Ms. Wellens' promotion to this level because she became pregnant in 2010 and took maternity leave in 2011.

27. While Ms. Wellens was on maternity leave, her supervisor, District Manager Brian Komrosky ("DM Komrosky") made unlawful and degrading comments about Ms. Wellens' pregnancy and caregiver status. For example, in April 2011, during a Las Vegas business trip, DM Komrosky referred to Ms. Wellens as a "baby-maker" during a conversation with Richard VanDePol, a male sales employee.

28. Upon returning from maternity leave in July 2011, Ms. Wellens elected to work part-time pursuant to the Company's flex time policy. From July 2011 to October 2011, Ms. Wellens regular paychecks dramatically decreased to $300 per pay period. Apparently, the HR department grossly mismanaged Ms. Wellens' (and other pregnant employees') disability/maternity leave benefits and claimed that Ms. Wellens had been

7

1    "overpaid" during her maternity leave. Ms. Wellens complained to HR about this

2    compensation offset. HR did not provide an adequate justification for its

3    mismanagement of her disability/maternity leave benefits and instead told Ms. Wellens

4    she should consider herself "lucky" the Company was even allowing her to work part-

5    time.

6        29.    Ms. Wellens also complained to HR about her inability to breastfeed

7    during certain Company-sponsored events. In response, HR told Ms. Wellens that

8    breastfeeding could not interfere with work-related events, such as outside dinners and

9    boat rides in Seattle. Accordingly, Ms. Wellens and other female employees who were

10   breastfeeding during this timeframe were not able to pump breast milk during Company-

11   sponsored events.

12       30.    From November 2011 to February 2012, Ms. Wellens switched from part-

13   time to full-time hours. Ms. Wellens worked at least 40 hours a week as a full-time

14   employee. However the Company continued to pay her at part-time rate. Ms. Wellens

15   again complained about unequal pay, disparate treatment, and pregnancy discrimination

16   to HR and DM Komrosky. In response, DM Komrosky called Ms. Wellens a

17   "disgruntled employee" and was otherwise dismissive of her concerns. Thereafter,

18   Daiichi Sankyo consistently required Ms. Wellens to work full-time hours while paying

19   her at a part-time rate until it finally corrected the problem in February 2012.

20       31.    In February 2012, during a Seattle business trip, DM Komrosky made

21   disparaging remarks regarding pregnancy/motherhood, telling Ross Rushton, a male sales

22   employee, "Hey, if you want to have your own [hotel] room, just say you're a

23   breastfeeding mom." In March 2012, during another business trip to San Diego,

24   California, DM Komrosky told a group of employees, "Let's take a group picture, but

25   instead of saying 'cheese,' let's say 'maternity leave.'" DM Komrosky's offensive

26   "joke" made female employees who had just returned from maternity leave feel

27   uncomfortable and uneasy.

28   //

8

32.     In April 2012, Regional Director Adam Arana ("RD Arana") invited sales representatives to a retention meeting. During this meeting, RD Arana greeted all of Ms. Wellens' male colleagues but deliberately refused to acknowledge Ms. Wellens' presence.   Ms. Wellens found such behavior suspect given the fact that she had previously lodged HR complaints about gender discrimination and also because at that time Ms. Wellens was the top-ranked sales representative out of approximately 500 sales representatives in the Pacific Northwest region.

33.     Similarly, DM Komrosky routinely recognized male sales employees for their accomplishments and supported their careers and failed to extend the same recognition and support to female sales representatives, especially those with children. For instance, DM Komrosky regularly scheduled strategy meetings with male sales employees to help improve their performance and rewarded their achievements with compensation perks and company-sponsored dinners/events.   DM Komrosky did not offer female sales employees comparable opportunities.   Specifically, DM Komrosky failed to adequately acknowledge Ms. Wellens and fellow Class Representative Ms. Vaughn with requisite rewards even after both women won 23 consecutive district contests.   Ms. Wellens and Ms. Vaughn complained to DM Komrosky about this disparate treatment. DM Komrosky responded by saying: "I thought you would rather be home with your families and kids."

34.     In July 2012, Ms. Wellens received her 360 performance review, which was conducted by DM Komrosky. In the review, DM Komrosky stated that Ms. Wellens had no interest in developing her skills with the Company. Ms. Wellens disagreed with DM Komrosky's assessment and clarified that she was interested in becoming a mentor and being promoted to Specialty Sales Representative.   However, Mr. Komrosky discounted her career development interests.

35.     DM Komrosky has also subjected Ms. Wellens to heightened scrutiny and disparate treatment since he learned of Ms. Wellens' involvement with the instant lawsuit.

9

**B.    PLAINTIFF KELLY JENSEN**

36.    Ms. Jensen is currently a Primary Care Sales Representative III in Daiichi Sankyo's Southern California Region. In August 2008, Daiichi Sankyo hired Ms. Jensen as a Primary Care Sales Representative II. Prior to joining the Company, Ms. Jensen had two and a half years of sales representative experience.

37.    During her tenure with Daiichi Sankyo, Ms. Jensen has consistently achieved superior results and distinguished herself as a top performer at the Company. In 2009, Ms. Jensen was ranked 4th out of approximately 70 sales representatives in sales growth in the Southern California Region (previously known as the West region) and won a Director Cabinet award due to her stellar sales performance. Since 2010, Ms. Jensen has consistently ranked in the top 30 to 40 % in her region.

38.    As detailed herein, despite Ms. Jensen's performance, the Company has systematically discriminated against her because of her gender and caregiver status.

### Pay, Promotion, and Pregnancy Discrimination

39.    Upon information and belief, the Company assigned Ms. Jensen during her initial hire to a lower level position, lower compensation band, and/or lower tier in comparison to similarly situated male employees. Additionally, Ms. Jensen's starting salary was $65,000, which was well under market given Ms. Jensen's experience, title, and responsibilities.

40.    Ms. Jensen has also received unwarranted lower merit increases, bonuses, and other compensation perks than male sales representatives, including male coworkers on her sales team.

41.    In August 2011, Ms. Jensen became pregnant. She took maternity leave from April to July 2012.

42.    In March 2012, after the male sales leadership team learned of Ms. Jensen's pregnancy, they told Ms. Jensen that she could no longer market Welchol to physicians. Upon information and belief, the male sales leadership team knew that taking Ms. Jensen off Welchol would negatively impact her career because Ms. Jensen's prior

10

1  Welchol marketing efforts were producing marked results for her in her territory.

2  Instead, the male sales leadership team shifted Ms. Jensen's Welchol responsibilities to a

3  male sales representative. As a result of this discriminatory change in responsibilities,

4  the male sales employee's sales rankings, bonus opportunities, and promotion prospects

5  increased, while Ms. Jensen's sales rankings and employment opportunities decreased.

6  43.  Upon returning from maternity leave in July 2012, Ms. Jensen's regular

7  paychecks dramatically decreased to an average of $800 per pay period as a post-

8  maternity leave compensation offset. As occurred with fellow Class Representative Sara

9  Wellens, the HR department recklessly mismanaged Ms. Jensen's disability/maternity

10  leave benefits and claimed that Ms. Jensen was overpaid $7,129.43 during her maternity

11  leave. Ms. Jensen is unaware of any male sales employees who have been subjected to

12  such a high compensation offset after returning from disability leave.

13  44.  In July 2012, Ms. Jensen elected to work part-time pursuant to the

14  Company's flex time policy. Her supervisor, District Manager, Shane Widener ("DM

15  Widener"), was not supportive of Ms. Jensen's decision to work part-time and pressured

16  her to start working full-time as soon as possible. Ms. Jensen's male colleagues also told

17  her that she should work full-time. Upon information and belief, Ms. Jensen was

18  strongly encouraged to stop working a flexible schedule because of Daiichi Sankyo's

19  stereotypical view that working mothers or those seeking to work part-time are less

20  committed to their jobs and the success of the Company.

21  45.  Daiichi Sankyo also discriminated against Ms. Jensen by denying her

22  equal promotional opportunities, and promoting lesser qualified employees without

23  childcare responsibilities more quickly than her. In September 2012, Ms. Jensen applied

24  for a promotion to the Specialty Sales Representative position. Despite Ms. Jensen's

25  qualifications, the Company gave the Specialty Sales Representative position to a sales

26  employee without any childcare responsibilities. Further, this sales employee had less

27  than two years of sales experience and was less qualified than Ms. Jensen. When Ms.

28  Jensen asked District Manager Joe Chirco ("DM Chirco") what she could have done

11

1   differently in order to receive the promotion, DM Chirco told her that there was nothing
2   she could have done.  DM Chirco also told a highly qualified female applicant, who
3   applied for the position while on disability, that the other candidates (without children)
4   were more "up and running."  Despite Daiichi Sankyo's repeated failures to promote Ms.
5   Jensen, she continues to seek advancement opportunities at the Company.

6       46.     In December 2012, DM Widener conducted Ms. Jensen's annual
7   performance review.  In the review, DM Widener lowered Ms. Jensen's rankings in five
8   categories in an effort to manage her out of the Company.  DM Widener has also
9   insinuated to Ms. Jensen that it would be a good idea for her to start talking to outside
10  employment recruiters for other job opportunities.

11          **C.    PLAINTIFF JACQUELINE PENA**

12      47.     In May 2006, the Company hired Ms. Pena as a Primary Care Sales
13  Manager.  Prior to joining Daiichi Sankyo, Ms. Pena had seven years of pharmaceutical
14  sales and management experience.  In 2009, Ms. Pena was promoted to a Cardiovascular
15  Sales Manager.  In October 2011, Daiichi Sankyo discriminatorily demoted Ms. Pena to a
16  Senior Cardiovascular Sales Representative, a position she held until her wrongful
17  termination on November 14, 2012.

18      48.     While employed at Daiichi Sankyo, Ms. Pena consistently achieved
19  superior results and distinguished herself as a top performer.  She has won several sales
20  awards, including multiple high Gold Cup rankings.  The Gold Cup Award is the most
21  prestigious award given by the Company and is reserved for the top 3% of sales
22  employees nationwide.

23      49.     As detailed herein, despite Ms. Pena's performance, the Company has
24  systematically discriminated against her because of her gender and caregiver status.

25              **Pay, Promotion, and Pregnancy Discrimination**

26      50.     Upon information and belief, Daiichi Sankyo assigned Ms. Pena during
27  her initial hire to a lower level position, lower pay band, and/or lower tier than similarly
28  situated male employees.

51. For the 2006 fiscal year, Ms. Pena was denied her rightly earned Platinum Performer Bonus, Gold Cup trip, and full incentive compensation because of her gender, and/or for becoming pregnant and taking maternity leave.

52. For both the 2007 and 2008 fiscal years, Ms. Pena, yet again, was Gold Cup ranked. These accomplishments were significant given the fact that Ms. Pena was assigned to a poor performing sales district. Gold Cup ranked male sales employees typically receive merit increases in the 8-10% range. However, in 2009, Ms. Pena's merit increase was prorated to much less than 8% because she took maternity leave.

53. In 2009, Daiichi Sankyo discriminatorily denied Ms. Pena a promotion to the senior status compensation tier. Additionally, in 2009, 2010, and 2011, Daiichi Sankyo failed to pay Ms. Pena her full incentive compensation and/or increase her compensation and title because of her gender and/or because she became pregnant and took maternity leave.

54. Ms. Pena was pregnant in 2007, 2009, and 2011. Ms. Pena took maternity leave from August to December 2007, October 2008 to March 2009, and May to August 2011.

55. In late 2011, Ms. Pena returned from maternity leave and asked to use the Company's flex work policy, which was designed to allow new parents to bond with their children. Ms. Pena's request was approved; however, she was subsequently forced to work during her days off and on the weekends without compensation. Daiichi Sankyo refused to pay Ms. Pena's full salary while requiring that she intermittently work full-time.

56. During this time, Ms. Pena's direct manager, Regional Director Jamie Paplomatas ("RD Paplomatas") inappropriately asked Ms. Pena at a lunch in front of her peers if she was planning to breastfeed while working. In later communications, RD Paplomatas discouraged Ms. Pena from breastfeeding. Ms. Pena was not given appropriate times or areas where she could pump breast milk, which forced her to stop breastfeeding prematurely.

13

57.     RD Paplomatas also told Ms. Pena that she could not do her job because she had children, took maternity leave, and was seeking to work a flexible work schedule. Further, RD Paplomatas has subjected Ms. Pena to heightened scrutiny and has called her degrading names, such as "dumbass," in the presence of large groups of employees.

58.     In October 2011, Daiichi Sankyo essentially demoted Ms. Pena from Sales Manager to a Senior Cardiovascular Sales Representative position because of its discriminatory view that Ms. Pena could no longer do her job after having children. RD Paplomatas told Ms. Pena that she would be managed out once her flex-time schedule ended if she did not accept the demotion. This demotion also came with a significant reduction in pay.

59.     Ms. Pena complained to HR Representative Terri Williams about this unlawful disparate treatment to no avail. Under duress, Ms. Pena accepted the demotion in order to stay employed.

60.     Daiichi Sankyo attempted to categorize Ms. Pena's demotion and reduction in pay as part of a layoff that did not pertain to her division. The Company filled Ms. Pena's vacated district manager position by hiring DM Chirco, a similarly situated male manager who also had children but who, due to his gender, the Company perceived as capable of handling his work responsibilities.

61.     In November 2011, a month after Ms. Pena's forced demotion, Daiichi Sankyo decreased the number of non-California sales representatives in Ms. Pena's former district. As a result, DM Chirco had substantially less travel and managerial demands than Ms. Pena had while she held the district manager position with a newborn baby.

62.     Additionally, the salary decrease that accompanied Ms. Pena's demotion was larger than the salary decreases typically associated with demotions at the Company. For example, even though Ms. Pena was a Cardiovascular Manager with twelve years of experience, she received a much larger reduction in salary than a similarly situated male employee, District Manager Jim Warkentin, when he was demoted to Primary Care Sales

14

1 | Representative.

2 |     63.    In 2009, the Company also forced Ms. Pena to relocate from Los Angeles
3 | to Orange County. Contrary to Company practice, however, Daiichi Sankyo did not
4 | provide Ms. Pena with a relocation package. Other employees have received generous
5 | relocation allowances under similar circumstances before and after Ms. Pena's forced
6 | relocation.

7 |     64.    Nevertheless, Ms. Pena excelled in her new role following her demotion
8 | and led the Northern Los Angeles district in hospital dollar sales and hypertension
9 | prescription sales.

10 | ## Retaliation & Wrongful Termination

11 |     65.    After Ms. Pena returned from her 2011 maternity leave, Ms. Pena's
12 | predominantly male managers attempted to manage her out of the Company by
13 | subjecting her to heightened scrutiny and adverse treatment because Ms. Pena
14 | complained about gender discrimination and had taken protected medical leaves. In
15 | April 2012, DM Chirco tried to force Ms. Pena to accept another demotion to a Primary
16 | Care Sales position in order to remove her from his and RD Paplomatas' sales team.
17 | After Ms. Pena refused to take another discriminatory pay cut and demotion, Ms. Pena's
18 | managers became increasingly hostile towards her.

19 |     66.    In May 2012, Ms. Pena had to go on disability leave because of the stress
20 | and anxiety she experienced due to the discrimination she was subjected to at work.

21 |     67.    In September 2012, Ms. Pena filed a charge of discrimination with the
22 | EEOC and DFEH, alleging that Daiichi Sankyo had discriminated against her based on
23 | her gender and pregnancy/caregiver status.

24 |     68.    On November 14, 2012, prior to Ms. Pena's return from her leave, Daiichi
25 | Sankyo unlawfully terminated her employment. Upon information and belief, the
26 | Company terminated Ms. Pena because of her gender and pregnancy/caregiver status, and
27 | in retaliation for her engaging in protected conduct related to that status, including taking
28 | maternity leave and complaining of gender/pregnancy discrimination to HR, the EEOC,

15

1  and the DFEH.

2  **D.    PLAINTIFF BERNICE GIOVANNI**

3      69.    In August 2009, Daiichi Sankyo hired Ms. Giovanni as a Pharmaceutical

4  Sales Representative I in the Oakland, California territory.  Prior to joining the Company,

5  Ms. Giovanni had five years of sales representative experience.

6      70.    During her tenure with Daiichi Sankyo, Ms. Giovanni consistently

7  achieved superior results and distinguished herself as a top performer at the Company.

8  She won several awards and in 2011 was ranked 8th out of over 200 sales representatives

9  in sales growth in the Pacific Northwest region.

10      71.    As detailed herein, despite Ms. Giovanni's performance, the Company

11  systematically discriminated against her because of her gender and caregiver status.

12                **Pay, Promotion, and Pregnancy Discrimination**

13      72.    Upon information and belief, Daiichi Sankyo assigned Ms. Giovanni

14  during her initial hire to a lower level position, lower compensation band, and/or lower

15  tier than similarly situated male employees.  Ms. Giovanni also received lower merit

16  increases, bonuses, and other compensation perks than similarly situated male sales

17  representatives.

18      73.    The Company has also discriminated against Ms. Giovanni by denying her

19  equal promotional opportunities afforded to similarly situated male sales employees.

20  Specifically, the Company fast-tracked and promoted a lesser qualified Sales

21  Representative on her sales team to a Specialty Representative position, while causing

22  Ms. Giovanni's career to stagnate because of her gender, caregiver status, and/or for

23  taking maternity leave.

24      74.    Specifically, Ms. Giovanni became pregnant in November 2010 and took

25  maternity leave from July 2011 to January 2012.  In March 2011, Ms. Giovanni's

26  supervisor, DM Komrosky made many inappropriate comments about women with

27  children and breastfeeding.  As discussed above, DM Komrosky referred to Class

28  Representative Sara Wellens, who was also on Ms. Giovanni's sales team, as a "baby-

16

Case No. _____  -- CLASS AND COLLECTIVE ACTION COMPLAINT

1  maker."

2      75.    Additionally, in March 2011, the Company housed Ms. Giovanni in a
3  hotel room that was located approximately 1.2 miles away from the conference meetings
4  during a business trip in Las Vegas, Nevada. As such, it was difficult for her to commute
5  and/or walk to business meetings. Worse yet, some Company meetings were held in bars
6  that contained cigarette and/or cigar smoke, which was obviously toxic to Ms. Giovanni
7  and her baby's health.

8      76.    Ms. Giovanni had to seek emergency medical attention during the Las
9  Vegas business trip because of rapid health deterioration that was precipitated by her
10  work environment. Among other things, Ms. Giovanni had blood in her urine and her
11  legs became swollen. As a result of these developments, Ms. Giovanni had to start her
12  maternity leave prematurely.

13      77.    Upon returning from maternity leave in January 2012, Ms. Giovanni's
14  paycheck was dramatically decreased to $650 per pay period. As occurred with Class
15  Representatives Sara Wellens and Kelly Jensen, the HR department mishandled Ms.
16  Giovanni's disability/maternity leave benefits. In January 2012, Ms. Giovanni contacted
17  HR to inquire about the offset in her paychecks and received no response. In February
18  2012, Ms. Giovanni contacted HR again and learned that she had to pay the Company
19  back $5,839.16 because of HR's reckless administration of its maternity leave
20  benefits/policies.

21      78.    At a Seattle business trip in February 2012, DM Komrosky told a male
22  sales employee, Ross Rushton, that Mr. Ruston should say he was a "breastfeeding mom"
23  in order for Mr. Rushton to get his own hotel room during business trips. Ms. Giovanni
24  was a nursing mother when DM Komrosky made these comments and it was distressing
25  to her to be exposed to such blatant gender and pregnancy discrimination.

26      79.    In March 2012, during a business trip to San Diego, California, DM
27  Kormosky made a "joke" by telling a group of employees to say "maternity leave"
28  instead of "cheese" when taking a group picture. DM Kormosky's comment made Ms.

17

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1   Giovanni and her female coworkers who had just returned from maternity leave feel very
2   uncomfortable.

3       80.     Also, after Ms. Giovanni returned from maternity leave, she learned that
4   her number 8-ranked sales position had essentially defaulted to a male sales
5   representative on her team, who was not trained or knowledgeable about the
6   pharmaceutical sales underpinning the ranking. This change in ranking adversely
7   impacted Ms. Giovanni's promotion prospects, bonus opportunities, as well as her
8   opportunity to win the Gold Cup award. Ms. Giovanni's ranking dropped from 8 to 64 in
9   2012 because the Company permitted the male sales representative on Ms. Giovanni's
10  team to take credit for her prior sales efforts.

11      81.     In March 2012, Ms. Giovanni was forced to resign from Daiichi Sankyo
12  because of the gender and caregiver discrimination she experienced.

13      **E.     PLAINTIFF LARA HOLLINGER**

14      82.     In August 2008, Daiichi Sankyo hired Ms. Hollinger as a District
15  Manager. Ms. Hollinger held that position until she was forced to resign in August 2012
16  because of the gender discrimination she was subjected to at the Company. Prior to
17  joining the Company, Ms. Hollinger had eight years of management experience.

18      83.     While employed by Daiichi Sankyo, Ms. Hollinger consistently achieved
19  superior results and distinguished herself as a top performer. In 2010, she was the top
20  ranked district manager in the West region.

21      84.     As detailed herein, despite Ms. Hollinger's performance, the Company
22  systematically discriminated against her because of her gender.

23                  **Pay and Promotion Discrimination**

24      85.     Upon information and belief, Daiichi Sankyo assigned Ms. Hollinger
25  during her initial hire to a lower level position, lower compensation band, and/or lower
26  tier than similarly situated male sales employees. Ms. Hollinger also received lower
27  merit increases, bonuses, and other compensation perks than her sales rankings and
28  accomplishments warranted. Specifically, despite her ranking as No. 1 District Manager

                                                                    18

1  in the West region in 2010, Ms. Hollinger received lower merit increases compared to her
2  male coworkers, John Mo, Shane Widener, Glen Mott, and John Bellar. Ms. Hollinger
3  complained to Regional Director Frank Schellack ("RD Schellack"). However, RD
4  Schellack failed to address Ms. Hollinger's concerns. In July 2012, Ms. Hollinger
5  received the same merit increase (2.99%) as her male counterpart, DM Komrosky, who
6  ranked substantially lower than her. Ms. Hollinger complained to Regional Director
7  Adam Arana ("RD Arana") about her pay and the Company's overall failure to
8  acknowledge or reward her accomplishments. However, RD Arana rebuffed her
9  concerns.

10      86.   Daiichi Sankyo also discriminated against Ms. Hollinger by
11  promoting/tiering lesser qualified male employees more rapidly than her. For example,
12  comparably situated District Managers John Mo, Shane Widener, and Herbert Van Patton
13  were promptly promoted to a Senior District Manager position, yet Ms. Hollinger
14  remained a District Manager throughout her four years with Daiichi Sankyo.

15      87.   The Company also subjected Ms. Hollinger to other forms of unlawful
16  disparate treatment. Specifically, in February 2011, rumors circulated within the sales
17  organization that the Company was going to undergo a corporate realignment. Before the
18  realignment was officially announced, RD Arana began assigning work to Ms.
19  Hollinger's male colleagues, assuming they would be on his team. Ms. Hollinger
20  informed HR of Mr. Arana's actions. The company took no action in response to Ms.
21  Hollinger's complaint in spite of being informed of RD Arana's indisputable motive and
22  intent to work almost exclusively with male district managers. When the realignment was
23  announced, Ms. Hollinger was placed on a sales team headed by RD Arana, who then
24  subjected Ms. Hollinger to heightened scrutiny and hostility for complaining about RD
25  Arana's biased and discriminatory behavior.

26      88.   While RD Arana was Ms. Hollinger's supervisor, he also habitually
27  undermined Ms. Hollinger's decisions. RD Arana even hired an under-qualified male
28  employee to join Ms. Hollinger's sales team. When Ms. Hollinger expressed concerns

19

1  that the hire was mediocre, RD Arana told her that the part of her district where the new
2  male hire was placed was "not important."

3      89.    In 2012, RD Arana provided Ms. Hollinger with her 360 Performance
4  Review and informed her that he had editorial license over her peer evaluations. Ms.
5  Hollinger's review did not coincide with her stellar sales performance. Upon information
6  and belief, RD Arana unilaterally conducted Ms. Hollinger's performance review – and
7  provided negative comments – in retaliation for Ms. Hollinger's complaints of
8  discrimination. Furthermore, the writing style throughout the review was consistent,
9  suggesting that one person wrote all the reviews. Moreover, all of Ms. Hollinger's male
10 peers denied submitting a 360 Performance Review of her. Ms. Hollinger informed HR
11 that she did not trust the sanctity of the review and asked for a formal investigation.
12 However, HR again failed to take any action in response to Ms. Hollinger's complaint.

13     90.    In August 2012, Ms. Hollinger resigned from the Company because of the
14 gender discrimination she experienced.

15     **G.    PLAINTIFF JENNIFER BENNIE**

16     91.    In October 2006, Ms. Bennie was hired by Daiichi Sankyo as a Primary
17 Care Sales Representative I. In March 2012, she resigned from the Company because of
18 the gender discrimination she experienced. At the time of her forced resignation, Ms.
19 Bennie was a Cardiovascular Sales Representative II.

20     92.    Prior to joining the Company, Ms. Bennie had seven years of management
21 experience while serving as a Naval Aviator and a Lieutenant in the United States Navy.
22 Throughout her employment at Daiichi, Ms. Bennie consistently distinguished herself as
23 a top performer and has been awarded Gold Cup and Platinum Performer distinctions.

24     93.    Despite Ms. Bennie's performance, the Company systematically
25 discriminated against her because of her gender and caregiver status.

26           **Pay, Promotion, and Pregnancy Discrimination**

27     94.    Upon information and belief, Daiichi Sankyo assigned Ms. Bennie during
28 her initial hire to a lower level position, lower compensation band, and/or lower tier than

20

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1  similarly situated male employees and failed to lend credence to Ms. Bennie's seven
2  years of prior management experience in the Navy.

3      95.    In late 2009, a vacancy existed in the Santa Barbara, California territory
4  when male sales representative, Petar Samac, moved out of state. Ms. Bennie applied to
5  lateral from Oceanside, California to the Santa Barbara territory. Ms. Bennie was
6  obviously qualified for the position as she had a proven record of success in Oceanside,
7  California.

8      96.    Nevertheless, the Company did not permit Ms. Bennie to even interview
9  for the job and she was denied the transfer without explanation. However, Mr. Samac,
10 the outgoing sales representative with close personal ties to the male sales leadership
11 team, received a $3,000 signing bonus for referring the outside hire who was ultimately
12 offered the position.

13     97.    In 2010, Ms. Bennie interviewed for a Cardiovascular Specialty Sales
14 Representative position. She was three months pregnant when she interviewed for the
15 position with her District Manager, Rodney Carr ("DM Carr"). DM Carr later asked Ms.
16 Bennie why she hid her pregnancy from him upon learning that she was pregnant. Ms.
17 Bennie explained to DM Carr that her pregnancy status had no bearing on her ability to
18 perform. DM Carr later told Ms. Bennie that he informed RD Paplomatas of Ms.
19 Bennie's pregnancy.

20     98.    Ms. Bennie was eventually offered the Cardiovascular position; however,
21 DM Carr again asked her why she purportedly hid her pregnancy. Such questioning
22 made Ms. Bennie uneasy and concerned about her job security as she has observed
23 Daiichi Sankyo systematically discriminate against female sales employees, especially
24 those who became pregnant.

25     99.    Ms. Bennie excelled in her role as a Cardiovascular Specialty Sales
26 Representative and, as a result, in March 2011, Ms. Bennie applied to become a district
27 manager. Ms. Bennie was ranked first in her district when she applied for the
28 management position. Ms. Bennie then interviewed for the position with RD Schellack.

21

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1  RD Schellack inappropriately questioned Ms. Bennie about her new caregiver
2  responsibilities throughout the interview. Furthermore, RD Schellack haphazardly
3  canceled a meeting Ms. Bennie had scheduled with an important client as part of the
4  interview process, thereby denying Ms. Bennie a significant opportunity to showcase her
5  skills and abilities.

6      100.   The Company later gave Mr. Samac, mentioned above, the District
7  Manager position. Unlike Ms. Bennie, Mr. Samac had been out of the territory for two
8  and a half years, had no management experience, never ranked in the top 3% of sales, and
9  never won a Gold Cup. Ms. Bennie asked RD Schellack what she could have done
10  differently in the interview process in order to have received the position. In response,
11  RD Schellack said there was nothing she could have done differently and that he could
12  not explain why she did not receive the promotion.

13     101.   In March 2012, Ms. Bennie resigned from the Company because of the
14  gender and pregnancy discrimination she experienced.

15              **TITLE VII AND FEHA CLASS ACTION ALLEGATIONS**

16          **Centralized Decision-Making, Ineffective Human Resources Functions, and**
17                       **Discriminatory Corporate Culture**

18     102.   Daiichi Sankyo's compact and predominantly male sales leadership team
19  maintains centralized control over the sales employees' terms and conditions of
20  employment, including, without limitation, job assignment, career progression,
21  promotion, discipline, demotion, evaluations, reorganizations/realignments, territory and
22  growth potential/account assignments, and compensation policies, practices and
23  procedures.

24     103.   Upon information and belief, a cadre of mostly male executives and senior
25  sales managers chair the Company's "Governance Board," "Compensation Committee,"
26  "Exception Committee," and other ad hoc committees. These committees are responsible
27  for reviewing and approving the acts, policies, and practices that either have a disparate
28  impact on female employees, or result in systemic disparate treatment of women.

22

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

104. For example, the "Governance Board" of Daiichi Sankyo "establishes the Daiichi Sankyo compensation philosophy and market pay strategy." Upon information and belief, the Governance Board is male-dominated and abuses its authority to make pay decisions that favor male employees over similarly situated female employees. Similarly, the "Compensation Committee" has editorial review over performance evaluations, which are used in calculating merit increases. Upon information and belief, the Compensation Committee is also male dominated and exploits its power to discriminatorily award or deny performance based bonuses. The "Exception Committee," which, upon information and belief, is also male-dominated, exercises overarching authority over tiered promotion decisions. The Exception Committee has full discretion in allocating developmental opportunities among Daiichi's employees and uses its authority to either deny or delay promotions to female sales employees.

105. Additionally, Daiichi Sankyo does not have a management development program or written/established criteria concerning eligibility to be considered for management. The male leadership team is thereby allowed to offer management opportunities to whomever it desires, irrespective of performance. Indeed, the male leadership team has actively tried to "manage out" female first level district managers, especially if they become pregnant, and replace them with underperforming or ill-qualified male employees.

106. Daiichi Sankyo, in effect, bars female sales employees from better and higher-paying positions, which have traditionally been held by male employees. The systemic means of accomplishing such gender-based stratification include, but are not limited to, Defendant's assignment, career progression, promotion, discipline, demotion, termination, evaluation, reorganizations/realignments, territory and growth potential/account assignments, and compensation policies, practices and procedures. These practices and procedures all suffer from a lack of: transparency; adequate quality standards and controls; sufficient implementation metrics; management/HR review; and opportunities for redress or challenge. As a result, employees are assigned, evaluated,

23

1  compensated, developed, promoted, and terminated within a system that is insufficiently

2  designed, articulated, explained or implemented to consistently, reliably or equitably

3  manage or reward employees.

4  107.   Within these flawed structures, specific policies and practices negatively

5  affect female sales employees. For example, Defendant's common and centralized

6  employment policies have been implemented in an intentionally discriminatory manner

7  and have had an adverse disparate impact on female sales employees.  Defendant's

8  centralized decision-making by predominately male executives and senior sales

9  leadership has been implemented in an intentionally discriminatory manner and has had

10 an adverse disparate impact on female sales employees.   Defendant's

11 realignments/restructurings and/or layoffs, management structure, and resource allocation

12 has been implemented in an intentionally discriminatory manner and has had an adverse

13 disparate impact on female sales employees.  Such policies, practices, and procedures are

14 not valid, job-related, or justified by business necessity.

15 108.   Without the appropriate standards, guidelines, or transparency necessary

16 to ensure an equitable workplace, unfounded criticisms may be lodged against female

17 sales employees who are female, pregnant, or mothers, and illegitimate criticisms may be

18 given undue weight.  Moreover, taking leave or flex time for pregnancy and caretaking

19 reasons can constitute a negative factor in employees' evaluations, compensation, and

20 promotion prospects.  Defendant's HR and management have failed to curb a corporate

21 culture that presumes that being a mother makes an employee less dedicated or

22 productive.

23 109.   These problems are systemic and company-wide because, upon

24 information and belief, they all stem from flawed policies, practices and procedures that

25 emanate from the Company's centralized predominantly male sales leadership team.

26 110.   Where HR complaint and compliance policies exist, they lack meaningful

27 quality controls, standards, implementation metrics, and means of redress.   Concerns

28 about discrimination made to leadership and HR itself are allowed to go unaddressed.

24

1     Worse, there is no meaningful separation between the HR complaint processes and the
2     executives and managers who create discriminatory or hostile work conditions for
3     women and mothers, such that victims of discrimination often face retaliation or are
4     dissuaded from voicing concerns altogether.

5         111.    Defendant has failed to impose adequate discipline on male employees
6     who violate equal employment opportunity laws and have failed to create adequate
7     incentives for its managerial and supervisory personnel to comply with such laws
8     regarding the employment policies, practices, and procedures described above.

9         112.    Thus, Defendant tolerates and even cultivates a hostile environment in
10    which women and mothers are openly devalued and where (a) retaliation for voicing
11    gender discrimination complaints is the norm, and (b) women and mothers who question
12    or even inadvertently disrupt the Company's gendered norms are routinely pushed out of
13    the Company.

14        113.    In sum, Defendant has demonstrated a reckless disregard and deliberate
15    indifference to its female sales employees by overlooking or otherwise dismissing even
16    blatant evidence of gender discrimination.

17        114.    Because of Defendant's pattern or practice of gender discrimination and
18    disparate impact gender discrimination, the Class Representatives and class they seek to
19    represent have been individually and systemically discriminated against. Such gender
20    discrimination includes, without limitation: (a) paying the Class Representatives and
21    other female sales employees less than similarly situated male employees; (b) failing to
22    promote or advance the Class Representatives and other female sales employees at the
23    same rate as similarly situated male employees; (c) treating pregnant employees and
24    mothers differently from non-pregnant employees, male employees, and non-caregivers;
25    (d) carrying out discriminatory hires, job assignments, job reassignments, demotions,
26    terminations, realignments/restructurings, and/or layoffs; (e) sexual harassment and/or
27    hostile work environment; (f) retaliation; (g) failing to prevent, respond to, adequately
28    investigate, and/or appropriately resolve instances of gender discrimination, sexual

25

1 harassment, retaliation, and pregnancy/caregiver discrimination in the workplace, and (h)

2 other adverse employment actions.

3       115.    The Class Representatives and the class have no plain, adequate, or

4 complete remedy at law to redress the wrongs alleged herein, and this suit is their only

5 means of securing adequate relief.    The Class Representatives and the class have

6 suffered, and will continue to suffer, irreparable injury from Defendant's ongoing,

7 unlawful policies, practices, and procedures as set forth herein unless those policies,

8 practices, and procedures are enjoined by this Court.

9                   **Class Definitions of the Title VII and FEHA Classes**

10       116.    Class Representatives seek to maintain claims on their own behalf and on

11 behalf of a class of current, former, and future female sales employees in a sales

12 representative and first level district manager role, including, without limitation, Sales

13 Representative; Sales Representative I-V; Sales Specialist; Senior Sales Specialist; Senior

14 Sales Professional; Cardiovascular ("CV") Specialty Sales Representative; CV Specialty

15 Sales Representative I-III; Senior CV Specialty Sales Representative; Senior CV

16 Specialty Sales Professional; Hospital Representative; Hospital Representative I-3;

17 Senior Hospital Sales Representative; Hospital Sales Specialist; and Primary Care, CV

18 and Hospital District Manager, who worked at any time in Defendant's sales organization

19 in the United States during the applicable liability period.

20       117.    The **Title VII Class** consists of all female sales employees as described

21 above, who are, have been, or will be employed by Defendant in the United States at any

22 time during the applicable liability period, including until the date of judgment in this

23 case. Upon information and belief, there are hundreds of such employees in the proposed

24 class.

25       118.    The **California FEHA Class** consists of all female sales employees as

26 described above, who are, have been, or will be employed by Defendant in California at

27 any time during the applicable liability period, including until the date of judgment in this

28 case. Upon information and belief, there are hundreds of such employees in the proposed

1 class.

2     119.   The Class Representatives seek to represent all of the female sales

3 employees described above. The systemic gender discrimination described in this

4 Complaint has been, and is, continuing in nature.

5                 **Efficiency of Class Prosecution of Common Claims**

6     120.   Certification of the class of female sales employees, as described above, is

7 the most efficient and economical means of resolving the questions of law and fact,

8 which are common to the claims of the Class Representatives and the proposed class.

9     121.   The individual claims of the Class Representatives require resolution of

10 the common questions of whether Defendant has engaged in a systemic pattern or

11 practice of gender discrimination or disparate impact discrimination against female sales

12 employees. Class Representatives seek remedies to eliminate the adverse effects of such

13 discrimination in their own lives, careers, and working conditions, and in the lives,

14 careers, and working conditions of the proposed class members, and to prevent continued

15 gender discrimination in the future.

16     122.   Plaintiffs have standing to seek such relief because of the adverse effect

17 that such discrimination has had on them individually and on female sales employees

18 generally. Defendant caused Plaintiffs' injuries through its discriminatory practices,

19 policies, and procedures, as well as its disparate treatment of employees who are female,

20 pregnant, and/or have caregiving responsibilities. These injuries are redressable through

21 systemic relief, such as an injunction, and other appropriate class-wide and individual

22 remedies sought in this action.

23     123.   In order to gain such relief for themselves, as well as for the class

24 members, Class Representatives will first establish the existence of systemic gender

25 discrimination as the premise for the relief they seek.

26     124.   Without class certification, the same evidence and issues would be subject

27 to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent

28 adjudications and conflicting obligations. Certification of the proposed class of females

1   is the most efficient and judicious means of presenting the evidence and arguments

2   necessary to resolve such questions for the Class Representatives, the proposed class, and

3   the Defendant.

4                    **Numerosity and Impracticability of Joinder**

5          125.   The class that the Class Representatives seek to represent is too numerous

6   to make joinder practicable.  Upon information and belief, the proposed class consists of

7   hundreds of current, former, and future female sales employees during the liability

8   period.  Defendant's pattern or practice of gender discrimination and disparate impact

9   gender discrimination also makes joinder impracticable by discouraging females from

10  applying for or pursuing promotional, training, or transfer opportunities, thereby making

11  it impractical and inefficient to identify many members of the class prior to determination

12  of the merits of Defendant's class-wide liability.

13                       **Common Questions of Law and Fact**

14         126.   The prosecution of the class claims requires the adjudication of numerous

15  questions of law and fact common to both the Class Representatives' individual claims

16  and those of the class they seek to represent.

17         127.   The common questions of law include, *inter alia*: (a) whether Defendant

18  has engaged in a pattern or practice of unlawful, systemic gender discrimination in its

19  compensation, assignment, selection, performance evaluation, promotion, advancement,

20  transfer, leave, and termination policies, practices, and procedures, and in the general

21  terms and conditions of work and employment under Title VII, FEHA, and/or other

22  statutes; (b) whether Defendant has engaged in unlawful disparate impact gender

23  discrimination in its compensation, assignment, selection, performance evaluation,

24  promotion, advancement, transfer, leave, and termination policies, practices, and

25  procedures, and in the general terms and conditions of work and employment under Title

26  VII, FEHA, and/or other statutes; (c) whether the failure to institute adequate standards,

27  quality controls, implementation metrics, or oversight in assignment, compensation,

28  evaluation, development, maternity and flex/time, promotion, and termination systems

                                                                                    28

violates Title VII, FEHA, and/or other statutes; (d) whether the lack of transparency and of opportunities for redress in those systems violates Title VII, FEHA, and/or other statutes; (e) whether senior management and HR's failure to prevent, investigate, or properly respond to evidence and complaints of discrimination in the workplace violates Title VII, FEHA, and/or other statutes; and (f) whether Defendant is liable for a continuing systemic violation of Title VII, FEHA, and/or other statutes; and a determination of the proper standards for proving a pattern or practice of discrimination by Defendant against its female sales professionals.

128.    The common questions of fact include whether Defendant has, *inter alia*: (a) used a system of assignment that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (b) through the use of that system of assignment, placed female sales professionals in job titles or classifications lower than similarly-situated male employees; (c) systematically, intentionally, or knowingly placed female sales professionals in job titles or classifications lower than similarly-situated male employees; (d) used a compensation system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (e) through the use of that compensation system, compensated female sales professionals less than similarly-situated males in salary, bonuses, and/or other perks; (f) systematically, intentionally, or knowingly compensated female sales professionals less than similarly-situated males; (g) used a system of development and mentoring that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (h) through the use of that development and mentoring system, failed to develop or mentor female sales professionals in a commensurate manner to their similarly-situated male counterparts; (i) systematically, intentionally, or knowingly failed to develop or mentor female sales professionals in a commensurate manner to their similarly-situated male counterparts; (j) used a promotion system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and

29

opportunities for redress; (k) through the use of that promotion system, precluded or delayed the promotion of female sales professionals into higher level jobs traditionally held by male employees; (l) systematically, intentionally, or knowingly precluded or delayed the promotion of female sales professionals into higher level jobs traditionally held by male employees; (m) used a system for performance evaluations that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (n) through the use of that performance evaluation system, inaccurately, inequitably, or disparately measured and classified female and male sales professionals' performance; (o) systematically, intentionally, or knowingly subjected female sales professionals to inaccurate, inequitable, or discriminatorily lowered performance evaluations; (p) through its policies, practices, and procedures, developed male and female sales professionals inequitably; (q) used a termination and/or layoff system that lacks meaningful or appropriate standards, implementation metrics, quality controls, transparency, and opportunities for redress; (r) through the use of that termination and/or layoff system, terminated or laid off female sales professionals at a higher rate than similarly-situated males; (s) systematically, intentionally, or knowingly terminated or laid off female sales professionals at a higher rate than similarly-situated males; (t) used maternity and flex time policies, practices, and procedures that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (u) through the use of those policies, practices, and procedures, treated pregnant employees and mothers differently and discriminatorily from non-pregnant employees, male employees, and non-caregivers; (v) systematically, intentionally, or knowingly subjected pregnant employees and mothers to disparate and discriminatory terms and conditions of employment; (w) used HR and EEO systems that lack meaningful or appropriate standards, implementation metrics, quality controls, transparency, or opportunities for redress; (x) through the use of those systems, minimized, ignored, or covered up evidence of gender discrimination and harassment in the workplace and/or otherwise mishandled the investigation of and

30

response to complaints of discrimination and harassment brought to the attention of senior management, the human resources department, or other reporting channels; (y) systematically, intentionally, knowingly, or deliberately showed an indifference to evidence of discrimination in the workplace or otherwise minimized, ignored, mishandled, or covered up evidence of or complaints about gender and pregnancy discrimination and harassment in the workplace; (z) failed to adequately or meaningfully train, coach, or discipline senior management on EEO principles and compliance; and (aa) carried out hires, terminations, demotions, job reassignments, realignments/restructurings, and/or layoffs in a discriminatory manner based on gender.

129.  The employment policies, practices, and procedures to which the Class Representatives and the class members are subjected are set by Defendant's predominantly male sales leadership team.  These employment policies, practices, and procedures are not unique or limited to any office location; rather, they apply to all office locations and, thus, affect the Class Representatives and class members in the same ways regardless of the office, area, or position in which they work.

130.  Throughout the liability period, a disproportionately large percentage of Defendant's executives, senior executives, officers, and senior managers have been male.

131.  Defendant's assignment, development, promotion, advancement, compensation, performance evaluation, leave, and termination policies, practices, and procedures all suffer from a lack of: transparency, adequate quality standards and controls, sufficient implementation metrics, management/HR review, and opportunities for redress or challenge.  As a result, employees are assigned, evaluated, compensated, developed, promoted, and terminated within a system that is insufficiently designed, articulated, explained, or implemented to consistently, reliably, or equitably manage or reward employees.

132.  Discrimination in development, promotion, advancement, compensation, performance evaluation, leave, and terminations occurs in a pattern or practice throughout all offices in Defendant's sales operations in the U.S.  Employment

31

1  opportunities are driven by personal familiarity, subjective decision-making, pre-
2  selection, and interaction between male executives and subordinates, rather than by merit
3  or equal opportunity. As a result, male employees have advanced and continue to
4  advance more rapidly to better and higher-paying jobs than do female sales employees.
5  Defendant's policies, practices, and procedures have had an adverse impact on female
6  sales employees seeking selection for, or advancement to, better and higher-paying
7  positions. In general, the higher the level of the job classification, the lower the
8  percentage of female sales employees holding it.

9  **Typicality of Claims and Relief Sought**

10  133. The claims of Class Representatives are typical of the claims of the class.
11  The relief sought by the Class Representatives for gender discrimination complained of
12  herein is also typical of the relief, which is sought on behalf of the class.

13  134. Like the members of the class, Class Representatives are female sales
14  employees who have worked for Defendant during the liability period.

15  135. Discrimination in assignment, selection, promotion, advancement,
16  compensation, leave, and termination affects the compensation and employment
17  opportunities of the Class Representatives and all the female sales employee class
18  members in the same or similar ways.

19  136. Defendant has failed to create adequate incentives for its executives and
20  managers to comply with its own policies and equal employment opportunity laws
21  regarding each of the employment policies, practices, and procedures referenced in this
22  Complaint, and have failed to discipline adequately its executives, managers, and other
23  employees when they violate Company policy or discrimination laws. These failures
24  have affected the Class Representatives and the class members in the same or similar
25  ways.

26  137. The relief necessary to remedy the claims of the Class Representatives is
27  the same relief necessary to remedy the claims of the class members in this case. Class
28  Representatives seek the following relief for their individual claims and for those of the

32

1 | members of the proposed class: (A) a declaratory judgment that Defendant has engaged
2 | in systemic gender discrimination and disparate impact discrimination against female
3 | sales employees by (1) paying female sales employees less than their male counterparts,
4 | (2) denying female sales employees promotions into better and higher-paying positions,
5 | (3) advancing female sales employees at a slower rate than their male counterparts, (4)
6 | treating pregnant employees and mothers differently from non-pregnant employees, male
7 | employees, and non-caregivers, (5) failing to prevent, respond to, adequately investigate,
8 | and/or appropriately resolve instances of gender discrimination and pregnancy/caregiver
9 | discrimination in the workplace, and (6) terminating, demoting, and reassigning a
10 | disproportionate number of females sales employees, including, without limitation,
11 | during corporate realignments/restructurings and/or layoffs; (B) a permanent injunction
12 | against such continuing discriminatory conduct; (C) injunctive relief which affects a
13 | restructuring of Defendant's promotion, transfer, assignment, demotion, training,
14 | performance evaluation, compensation, leave, and termination policies, practices, and
15 | procedures, so that female sales employees will be able to compete fairly in the future for
16 | promotions, transfers, and assignments to better and higher-paying positions with terms
17 | and conditions of employment traditionally enjoyed by male employees; (D) back pay,
18 | front pay, and other equitable remedies necessary to make the female sales employees
19 | whole from the Defendant's past discrimination; (E) punitive and nominal damages to
20 | prevent and deter Defendant from engaging in similar discriminatory practices in the
21 | future; (F) compensatory damages; (G) pre- and post-judgment interest; and (H)
22 | attorneys' fees, costs, and expenses.

23 | ### Adequacy of Representation

24 | 138. The Class Representatives' interests are co-extensive with those of the
25 | members of the proposed class, which they seek to represent in this case. Class
26 | Representatives seek to remedy Defendant's discriminatory employment policies,
27 | practices, and procedures so that female sales employees will no longer be prevented
28 | from advancing into higher paying and more desirable higher level positions. Plaintiffs

33

1   are willing and able to represent the proposed class fairly and vigorously as they pursue
2   their individual claims in this action.

3      139.   Class Representatives have retained counsel who is qualified, experienced,
4   and able to conduct this litigation and to meet the time and fiscal demands required to
5   litigate an employment discrimination class action of this size and complexity. The
6   combined interests, experience, and resources of Plaintiffs' counsel to litigate
7   competently the individual and class claims at issue in this case clearly satisfy the
8   adequacy of representation requirement of Federal Rule of Civil Procedure 23(a)(4).

9                          **Requirements Of Rule 23(b)(2)**

10     140.   Defendant has acted on grounds generally applicable to the Class
11  Representatives and the class by adopting and implementing systemic policies, practices,
12  and procedures that are discriminatory. Disparate impact and systemic gender
13  discrimination are Defendant's standard operating procedures rather than sporadic
14  occurrences. Defendant has refused to act on grounds generally applicable to the class
15  by, *inter alia*: (1) paying Plaintiffs and other female sales employees less than similarly-
16  situated male employees; (2) failing to promote or advance Plaintiffs and other female
17  sales employees at the same rate as similarly-situated male employees; (3) treating
18  pregnant employees and mothers differently from non-pregnant employees, male
19  employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate,
20  and/or appropriately resolve instances of gender discrimination, sexual harassment, and
21  pregnancy/caregiver discrimination in the workplace; and (5) carrying out discriminatory
22  hires, terminations, demotions, and/or job reassignments including, without limitation,
23  during corporate realignments/restructurings, and/or layoffs.

24     141.   Defendant's systemic discrimination and refusal to act on grounds that are
25  not discriminatory have made appropriate the requested final injunctive and declaratory
26  relief with respect to the class as a whole.

27                          **Requirements of Rule 23(b)(3)**

28     142.   The common issues of fact and law affecting the claims of Class

34

1   Representatives and proposed class members, including, but not limited to, the common

2   issues previously identified herein, predominate over any issues affecting only individual

3   claims.  These issues include whether Defendant has engaged in gender discrimination

4   against female employees by: (1) paying Plaintiffs and other female sales employees less

5   than similarly-situated male employees; (2) failing to promote or advance Plaintiffs and

6   other female sales employees at the same rate as similarly-situated male employees; (3)

7   treating pregnant employees and mothers differently from non-pregnant employees, male

8   employees, and non-caregivers; (4) failing to prevent, respond to, adequately investigate,

9   and/or appropriately resolve instances of gender discrimination, sexual harassment, and

10  pregnancy/caregiver discrimination in the workplace; and (5) carrying out discriminatory

11  hires, terminations, demotions, and/or job reassignments including, without limitation,

12  during corporate realignments/restructurings and or layoffs.

13      143.   A class action is superior to other available means for the fair and efficient

14  adjudication of the claims of the Class Representatives and members of the proposed

15  class.

16      144.   The cost of proving Defendant's pattern or practice of discrimination

17  makes it impracticable for the Class Representatives and members of the proposed class

18  to prosecute their claims individually.

19          **CALIFORNIA AND FEDERAL EQUAL PAY ACT CLAIMS**

20      145.   Plaintiffs Wellens, Jensen, Pena, Giovanni, Hollinger, and Bennie

21  incorporate by reference the allegations from the previous paragraphs of this Complaint

22  alleging class-based common policies and practices resulting in unequal pay earned by

23  similarly-situated female sales employees.

24      146.   Plaintiffs Wellens, Jensen, Pena, Giovanni, Hollinger, and Bennie bring

25  collective claims alleging violations of the Equal Pay Act ("EPA") as a collective action

26  pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b)

27  on behalf of all members of the EPA Class.  The **EPA Class** consists of all current,

28  former, and future female sales employees in a sales representative and first level district

1  manager role, including, without limitation, Sales Representative; Sales Representative I-
2  V; Sales Specialist; Senior Sales Specialist; Senior Sales Professional; Cardiovascular
3  ("CV") Specialty Sales Representative; CV Specialty Sales Representative I-III; Senior
4  CV Specialty Sales Representative; Senior CV Specialty Sales Professional; Hospital
5  Representative; Hospital Representative I-3; Senior Hospital Sales Representative;
6  Hospital Sales Specialist; and Primary Care, CV, and Hospital District Manager, who
7  worked at any time in Defendant's sales organization in the United States during the
8  applicable liability period.

9      147.    Plaintiffs Wellens, Jensen, Pena, Giovanni, Hollinger, and Bennie seek to
10  represent all of the female sales employees described above. The systemic gender
11  discrimination described in this Complaint has been, and is, continuing in nature.

12     148.    The **EPA Class** includes female sales employees, as described above, who
13  (a) were not compensated equally to males who had substantially similar job
14  classifications, job functions, job families, job codes, job titles, job descriptions, and/or
15  job duties based on Defendant's common employment policies and centralized decision-
16  making; (b) were not compensated equally to males who performed substantially similar
17  work based on Defendant's common employment policies and centralized decision-
18  making; and (c) who were denied assignment, placement, promotion, and/or
19  advancement opportunities that would have resulted in greater compensation in favor of
20  lesser qualified male employees based on Defendant's common employment policies and
21  centralized decision-making.

22     149.    Questions of law and fact common to the Plaintiffs and the EPA Class as a
23  whole include, but are not limited to, the following:

24     (a) Whether Defendant unlawfully failed and continues to fail to compensate
25  female sales employees at a level commensurate with similarly situated male employees;

26     (b) Whether Defendant unlawfully failed and continues to fail to assign, place,
27  promote, and advance female sales employees to higher paying positions in a fashion
28  commensurate with similarly situated males;

36

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1     (c) Whether Defendant's policy or practice of failing to compensate female sales

2 employees on a par with comparable male employees as a result of (a) and (b) violate

3 applicable provisions of the EPA; and

4     (d) Whether Defendant's failure to compensate female sales employees on par

5 with comparable male employees as a result of (a) and (b) was willful within the meaning

6 of the EPA.

7     150. Counts for violation of the EPA may be brought and maintained as an "opt-

8 in" collective action pursuant to 29 U.S.C. § 216(b), for all claims asserted by the

9 Plaintiffs, because their claims are similar to the claims of the EPA Class.

10     151. Plaintiffs Wellens, Jensen, Pena, Giovanni, Hollinger, Bennie, and the **EPA**

11 **Class** (a) are similarly situated; (b) have substantially similar job classifications, job

12 functions, job families, job titles, job descriptions, and/or job duties; and (c) are subject to

13 Defendant's common compensation policies and practices, and centralized decision-

14 making resulting in unequal pay based on sex by (i) failing to compensate female sales

15 employees on a par with men who perform substantially equal work and/or hold

16 equivalent levels, job titles, and positions, and (ii) failing to provide female sales

17 employees equal pay by denying opportunities for assignment, placement, promotion,

18 and advancement that would have resulted in greater compensation to them comparable

19 to those afforded to males who perform substantially equal work.

20     152. Plaintiffs Wellens, Jensen, Pena, Giovanni, Hollinger, and Bennie also

21 bring claims alleging violations of the California Equal Pay Act ("CA EPA") pursuant to

22 California Labor Code Section 1197.5 on behalf of all members of the **California EPA**

23 **Class**. The **California EPA Class** consists of all current, former, and future female sales

24 employees in a sales representative and first level district manager role, including,

25 without limitation, Sales Representative; Sales Representative I-V; Sales Specialist;

26 Senior Sales Specialist; Senior Sales Professional; Cardiovascular ("CV") Specialty Sales

27 Representative; CV Specialty Sales Representative I-III; Senior CV Specialty Sales

28 Representative; Senior CV Specialty Sales Professional; Hospital Representative;

37

1   Hospital Representative I-3; Senior Hospital Sales Representative; Hospital Sales

2   Specialist;  and Primary Care, CV, and Hospital District Manager, who worked at any

3   time in Defendant's sales organization in California during the applicable liability period.

**CAUSES OF ACTION**
**(INDIVIDUAL AND CLASS/COLLECTIVE ACTION CLAIMS)**

**COUNT 1**

**VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**GENDER DISCRIMINATION**
**42 U.S.C. § 2000e, *et seq.***
**(On Behalf of All Class Representatives, in their Individual and Representative**
**Capacities, and the Title VII Class Against Daiichi Sankyo)**

11      153.    Plaintiffs re-allege and incorporate by reference each and every allegation

12  contained in the previous paragraphs of this Complaint as if fully set forth herein.

13      154.    This Count is brought on behalf of all Plaintiffs in their individual and

14  representative capacities, and all members of the class.

15      155.    Daiichi Sankyo has discriminated against the Plaintiffs and the class in

16  violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e, *et seq.*, as amended by

17  the Civil Rights Act of 1991 ("Title VII"), by subjecting them to different treatment on

18  the basis of their gender.  Plaintiffs and the class have suffered both disparate impact and

19  disparate treatment discrimination as a result of Daiichi Sankyo's wrongful conduct.

20      156.    Daiichi Sankyo has discriminated against the Plaintiffs and all members of

21  the class by treating them differently from and less preferably than similarly-situated

22  male employees and by subjecting them to disparate pay, discriminatory denial of pay

23  raises, disparate terms and conditions of employment, discriminatory job assignment,

24  discriminatory demotions, discriminatory denial of promotions, harassment, hostile work

25  environments, and other forms of discrimination, in violation of Title VII.

26      157.    Defendant has failed to prevent, respond to, adequately investigate, and/or

27  appropriately resolve instances of gender discrimination and pregnancy/caregiver

28  discrimination in the workplace.

158. Defendant's conduct has been intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of the rights of the Class Representatives and all members of the class, entitling the Class Representatives and all members of the class to punitive damages.

159. Daiichi Sankyo's policies, practices, and/or procedures have produced a disparate impact on the Plaintiffs and the members of the class with respect to the terms and conditions of their employment.

160. As a result of Daiichi Sankyo's conduct alleged in this Complaint, the Class Representatives and the members of the class have suffered and continue to suffer harm, including but not limited to, lost earnings, lost benefits, lost future employment opportunities, and other financial loss, as well as non-economic damages.

161. By reason of the continuous nature of Defendant's discriminatory conduct, which persisted throughout the employment of the Class Representatives and the members of the class, the Class Representatives and the members of the class are entitled to application of the continuing violations doctrine to all violations alleged herein.

162. By reason of Defendant's discrimination, the Class Representatives and the members of the class are entitled to all legal and equitable remedies available for violations of Title VII, including reinstatement and an award of compensatory and punitive damages.

163. Attorneys' fees and costs should be awarded under 42 U.S.C. § 2000e-5(k).

## COUNT 2

### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
### PREGNANCY AND FAMILY RESPONSIBILITIES DISCRIMINATION
### 42 U.S.C. § 2000e(k) *et seq.*
**(On Behalf of Class Representatives Wellens, Pena, Jensen, Giovanni, and Bennie, in their Individual and Representative Capacities, and the Title VII Class Against Daiichi Sankyo)**

164. Plaintiffs re-allege and incorporate by reference each and every allegation

39

1  contained in the previous paragraphs of this Complaint as if fully set forth herein.

2      165.  This Count is brought on behalf of Plaintiffs Wellens, Pena, Giovanni, and

3  Bennie in their individual and representative capacities, and all members of the class.

4      166.  Defendant discriminated against the Class Representatives and the

5  members of the class because of or on the basis of pregnancy, childbirth, or related

6  medical conditions.

7      167.  The Class Representatives and members of the class were not treated the

8  same for all employment-related purposes, including receipt of disparate compensation

9  and raises, as other persons not so affected but similar in their ability or inability to work.

10     168.  Daiichi Sankyo's policies, practices, and/or procedures have produced a

11  disparate impact on the Plaintiffs and the members of the class with respect to the terms

12  and conditions of their employment.

13     169.  Defendant's conduct has been intentional, deliberate, willful, malicious,

14  reckless, and conducted in callous disregard of the rights of Class Representatives and

15  members of the class.

16     170.  As a direct and proximate result of Defendant's aforementioned conduct,

17  Class Representatives and all members of the class were damaged and suffered economic

18  losses and non-economic damages.

19     171.  By reason of the continuous nature of Defendant's discriminatory conduct,

20  persistent throughout the employment of Class Representatives and the class members,

21  Plaintiffs and the class members are entitled to application of the continuing violation

22  doctrine to all of the violations alleged herein.

23     172.  By reason of the pregnancy discrimination suffered as a result of

24  Defendant's discriminatory conduct, Plaintiffs and members of the class are entitled to

25  legal and equitable remedies available under Title VII, including an award of

26  compensatory and punitive damages.

27     173.  Attorneys' fees should be awarded under 42 U.S.C. § 2000e-5(k).

28  //

40

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

**COUNT 3**

**VIOLATION OF THE FAIR LABOR STANDARDS ACT OF 1938,
AS AMENDED BY THE EQUAL PAY ACT OF 1963
DENIAL OF EQUAL PAY FOR EQUAL WORK
29 U.S.C. §§ 206, *et seq.***
**(On Behalf of All Class Representatives, in their Individual and Representative
Capacities, and the EPA Class Against Daiichi Sankyo)**

174.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as if fully set forth herein.

175.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the EPA Class, including all EPA Plaintiffs who "opt in" to this action.

176.    Defendant has discriminated against the Class Representatives and the EPA Class in violation of the Fair Labor Standards Act of 1938, 29 U.S.C. §§ 206, *et seq.*, as amended by the Equal Pay Act of 1963 ("EPA"), by providing them with lower pay than similarly situated male colleagues even though Class Representatives, and all other similarly situated female sales employees, performed substantially similar duties requiring the same skill, effort, and responsibility of male counterparts, and are or were performed under similar working conditions.

177.    Defendant so discriminated by subjecting the Class Representatives and the EPA Plaintiffs to common discriminatory pay policies, including discriminatory salaries, bonuses, and other compensation incentives, and discriminatory assignments, denials of promotions, and other advancement opportunities that would result in higher compensation, and other forms of discrimination in violation of the EPA.

178.    The differential in pay between male and female employees was not due to seniority, merit, quantity or quality of production, but was due to gender.

179.    Defendant caused, attempted to cause, contributed to, or caused the continuation of, the wage rate discrimination based on sex in violation of the EPA.

180.    The foregoing conduct constitutes a willful violation of the EPA within

41

1  the meaning of 29 U.S.C. § 255(a). Because Defendant has willfully violated the EPA, a

2  three-year statute of limitations applies to such violations, pursuant to 29 U.S.C. § 255.

3      181. As a result of Defendant's conduct alleged in this Complaint, Class

4  Representatives and all EPA Plaintiffs have suffered and will continue to suffer harm,

5  including but not limited to: lost earnings, lost benefits, and other financial loss, as well

6  as non-economic damages.

7      182. By reason of Defendant's discrimination, Class Representatives and all

8  EPA Plaintiffs are entitled to all legal and equitable remedies available for violations of

9  the EPA including liquidated damages for all willful violations, prejudgment interest,

10  attorneys' fees, costs, and other compensation pursuant to 29 U.S.C. § 216(b).

11      183. Attorneys' fees should be awarded under 29 U.S.C. § 216(b).

12  **COUNT 4**

13
14  **VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT**

15  **CALIFORNIA GOVERNMENT CODE § 12940, *et seq.***
**GENDER DISCRIMINATION**

16  **(On Behalf of All Class Representatives , in their Individual and Representative Capacities, and the California FEHA Class Against Daiichi Sankyo)**

17

18      184. Plaintiffs re-allege and incorporate by reference each and every allegation

19  contained in the previous paragraphs of this Complaint as if fully set forth herein.

20      185. This Count is brought on behalf of all Plaintiffs in their individual and

21  representative capacities, and all members of the California FEHA class.

22      186. Daiichi Sankyo has discriminated against the Plaintiffs and the California

23  FEHA class in violation of the California Fair Employment and Housing Act (the

24  "FEHA"), Cal. Gov't Code § 12940, *et seq*, by subjecting them to different treatment on

25  the basis of their gender. Plaintiffs and the California FEHA class have suffered both

26  disparate impact and disparate treatment as a result of Defendant's wrongful conduct and

27  its policies, practices, and procedures.

28      187. Defendant has discriminated against the Class Representatives and all

42

1  members of the California FEHA class by treating them differently from and less
2  preferably than similarly-situated male employees and by subjecting them to disparate
3  pay, discriminatory denial of pay raises, disparate terms and conditions of employment,
4  discriminatory job assignment, discriminatory demotions, discriminatory denial of
5  promotions, harassment, hostile work environments and other forms of discrimination, in
6  violation of the FEHA.

7  188.  Defendant has failed to prevent, respond to, adequately investigate, and/or
8  appropriately resolve instances of gender discrimination and pregnancy/caregiver
9  discrimination in the workplace.

10  189.  Defendant's conduct has been intentional, deliberate, willful, malicious,
11  reckless, and conducted in callous disregard of the rights of the Class Representatives and
12  all members of the California FEHA class, entitling the Class Representatives and all
13  members of the California FEHA class to punitive damages.

14  190.  Daiichi Sankyo's policies, practices, and/or procedures have produced a
15  disparate impact on the Plaintiffs and the members of the California FEHA class with
16  respect to the terms and conditions of their employment.

17  191.  As a result of Daiichi Sankyo's conduct alleged in this complaint, the
18  Class Representatives and the members of the California FEHA class have suffered and
19  continue to suffer harm, including but not limited to, lost earnings, lost benefits, lost
20  future employment opportunities, and other financial loss, as well as non-economic
21  damages.

22  192.  By reason of the continuous nature of Defendant's discriminatory conduct,
23  which persisted throughout the employment of the Class Representatives and the
24  members of the class, the Class Representatives and the members of the California FEHA
25  class are entitled to application of the continuing violations doctrine to all violations
26  alleged herein.

27  193.  By reason of Defendant's discrimination, the Class Representatives and
28  the members of the California FEHA class are entitled to all legal and equitable remedies

43

1  available for violations of the FEHA, including reinstatement and an award of

2  compensatory and punitive damages.

3      194.  Attorneys' fees should be awarded under Cal. Gov't Code § 12940.

4                              **COUNT 5**

5  **VIOLATION OF THE CALIFORNIA FAIR EMPLOYMENT AND HOUSING
   ACT**

6  **CALIFORNIA GOVERNMENT CODE § 12940, et seq.**

7  **PREGNANCY AND FAMILY RESPONSIBILITIES DISCRIMINATION**
   **(On Behalf of Class Representatives Wellens, Jensen, Pena, Giovanni, and Bennie,**

8  **in their Individual and Representative Capacities, and the California FEHA Class**
   **Against Daiichi Sankyo)**

9

10     195.  Plaintiffs re-allege and incorporate by reference each and every allegation

11  in each and every aforementioned paragraph as if fully set forth herein.

12     196.  This Count is brought on behalf of Plaintiffs Wellens, Jensen, Pena,

13  Giovanni, and Bennie in their individual and representative capacities, and all members

14  of the class.

15     197.  Defendant has discriminated against the Class Representatives and all

16  members of the California FEHA class in violation of the FEHA, by subjecting them to

17  different treatment on the basis of their gender. Plaintiffs and the California FEHA class

18  have suffered both disparate impact and disparate treatment as a result of Defendant's

19  wrongful conduct and its policies, practices and procedures.

20     198.  Defendant has discriminated against the Class Representatives and all

21  members of the California FEHA class by treating them differently from and less

22  preferably than similarly-situated male employees and female employees without primary

23  caregiving responsibilities, and by subjecting them to differential and substandard terms

24  and conditions of employment, including but not limited to, discriminatory denials of fair

25  compensation, discriminatory denials of promotions and discriminatory treatment with

26  respect to work responsibilities and other terms and conditions of employment in

27  violation of the FEHA.

28     199.  Defendant's conduct has been intentional, deliberate, willful, malicious,

                                                                        44

1  reckless and conducted in callous disregard of the rights of the Class Representatives and

2  all members of the California FEHA class, entitling the Class Representatives and all

3  members of the California FEHA class to punitive damages.

4       200. By reason of the continuous nature of Defendant's discriminatory conduct,

5  which persisted throughout the employment of the Class Representatives and the

6  members of the California FEHA class, the Class Representatives and the members of the

7  class are entitled to application of the continuing violations doctrine to all violations

8  alleged herein.

9       201. As a result of Defendant's conduct alleged in this complaint, the Class

10 Representatives and the members of the California FEHA class have suffered and

11 continue to suffer harm, including but not limited to lost earnings, lost benefits, lost

12 future employment opportunities, and other financial loss, as well as non-economic

13 damages.

14      202. Defendant's policies, practices and/or procedures have produced a

15 disparate impact on the Class Representatives and the members of the class with respect

16 to the terms and conditions of their employment.

17      203. By reason of Defendant's discrimination, the Class Representatives and

18 the members of the California FEHA class are entitled to all legal and equitable remedies

19 available for violations of the FEHA, including an award of compensatory and punitive

20 damages.

21      204. Attorneys' fees should be awarded under Cal. Gov't Code § 12940 *et seq.*

22                            **COUNT 6**

23

24      **VIOLATION OF THE CALIFORNIA EQUAL PAY ACT**
     **CALIFORNIA LABOR CODE § 1197.5, *et. seq.***

25 **(On Behalf of All the Class Representatives, in their Individual and Representative
Capacities, and the California EPA Class Against Daiichi Sankyo)**

26      205. Plaintiffs re-allege and incorporate by reference each and every allegation

27 contained in the previous paragraphs of this Complaint as though fully set forth herein.

28      206. This Count is brought on behalf of all Plaintiffs in their individual and

1 | representative capacities, and all members of the California EPA class.

2 | 207. Defendant has discriminated against the Plaintiffs and all California EPA
3 | class members in violation of the California Labor Code § 1197.5, *et. seq.* Defendant has
4 | discriminated against the Plaintiffs and California EPA class members by treating them
5 | differently from and less preferably than similarly-situated male employees who
6 | performed jobs which required equal skill, effort, and responsibility, and which were
7 | performed under similar working conditions. Defendant so discriminated by subjecting
8 | them to discriminatory pay, discriminatory denials of bonuses and other compensation
9 | incentives, discriminatory denials of promotions and other advancement opportunities
10 | that would result in higher compensation, and other forms of discrimination in violation
11 | of the California Equal Pay Act.

12 | 208. Defendant caused, attempted to cause, contributed to, or caused the
13 | continuation of, the wage rate discrimination based on sex in violation of the California
14 | Equal Pay Act. Moreover, Defendant willfully violated the California Equal Pay Act by
15 | intentionally paying women less than men.

16 | 209. As a result of Defendant's conduct alleged in this Complaint and/or
17 | Defendant's willful, knowing, and intentional discrimination, the Plaintiffs have suffered
18 | and will continue to suffer harm, including but not limited to lost earnings, lost benefits,
19 | and other financial loss, as well as non-economic damages.

20 | 210. The Plaintiffs and the California EPA class are therefore entitled to all
21 | legal and equitable remedies, including doubled compensatory awards for all willful
22 | violations.

23 | 211. Attorneys' fees should be awarded under California Labor Code §
24 | 1197.5(g).

25 | //
26 | //
27 | //
28 | //

46

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

## COUNT 7

### VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT,
42 U.S.C. § 2000e(k), *et seq.*, and
### CALIFORNIA FAIR EMPLOYMENT AND HOUSING ACT,
Cal. Gov. Code § 12940, *et seq.*
### RETALIATION
(On Behalf of Jacqueline Pena Against Daiichi Sankyo)

212. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

213. Defendant retaliated against Ms. Pena for becoming pregnant and taking protected maternity leave. Defendant also retaliated against Ms. Pena for engaging in oppositional and/or protected activities by, *inter alia*, complaining about gender and pregnancy discrimination and filing a charge of discrimination with the U.S. Equal Employment Opportunity Commission and the California Department of Fair Housing and Employment.

214. Defendant took adverse employment actions against Ms. Pena for engaging in protected activities. Such adverse employment actions include subjecting her to heightened scrutiny and unfavorable terms and conditions of employment, including, without limitation, negative performance reviews, denial of pay increases and/or relocation compensation, demotions, and wrongful termination.

215. Defendant's actions were intentional, deliberate, willful, malicious, reckless, and conducted in callous disregard of causing harm to Ms. Pena.

216. As a direct and proximate result of Defendant's aforementioned conduct, Ms. Pena has been damaged and suffered economic losses, mental and emotional harm, anguish, and humiliation.

217. As a result of the Defendant's retaliation, Ms. Pena is entitled to all legal and equitable remedies available for violations of Title VII and the FEHA, including an award of compensatory and punitive damages.

//

47

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1    218.   Attorneys' fees should be awarded pursuant to 42 U.S.C. § 2000e-5(k) and

2   Cal. Gov't Code § 12940 *et seq.*

## COUNT 8

### WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY
### (On Behalf of Jacqueline Pena Against Daiichi Sankyo)

7    219.   Plaintiffs re-allege and incorporate by reference each and every allegation

8   contained in the previous paragraphs of this Complaint as though fully set forth herein.

9    220.   On November 14, 2012, Daiichi Sankyo terminated Ms. Pena for

10  becoming pregnant and taking protected maternity leave, and for engaging in

11  oppositional and/or protected activities by, *inter alia*, complaining about gender and

12  pregnancy discrimination and filing a charge of discrimination with the U.S. Equal

13  Employment Opportunity Commission and the California Department of Fair Housing

14  and Employment.

15   221.   Daiichi Sankyo's termination of Ms. Pena's employment as alleged herein

16  constitutes an unlawful employment practice in violation of public policy.   Class

17  Representative Pena was terminated for exercising the rights afforded to her under Title

18  VII, FMLA, FEHA, CRLA, PDA, and California's Business and Professions Code §

19  17200 *et seq.*  Daiichi Sankyo's retaliatory termination constitutes a violation of said

20  statues and violates California's prohibition against terminations motivated by purposes

21  that contravene fundamental public policies.

22   222.   As a direct, foreseeable, and proximate result of Daiichi Sankyo's

23  wrongful termination of her employment, Ms. Pena has suffered and continues to suffer

24  substantial losses of earnings and benefits, and emotional distress.

25   223.   The aforementioned conduct by Daiichi Sankyo was willful, wanton,

26  malicious, and oppressive, thereby warranting an award of exemplary and punitive

27  damages to Ms. Pena.

28  //

48

## COUNT 9

### UNFAIR COMPETITION IN VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE
### California Business and Professions Code § 17200-17208
### (On Behalf of All Class Representatives in their Individual and Representative Capacities, and the California FEHA and the California EPA Classes Against Daiichi Sankyo)

224.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the previous paragraphs of this Complaint as though fully set forth herein.

225.    This Count is brought on behalf of all Plaintiffs in their individual and representative capacities, and all members of the California classes.

226.    Defendant Daiichi Sankyo is a "person" as defined under California Business & Professions Code § 17021.

227.    Defendant's willful failure to pay women equally and otherwise offer women equal employment opportunities as alleged above, constitutes unlawful and/or unfair and/or fraudulent activity prohibited by California Business and Professions Code § 17200.  As a result of its unlawful and/or unfair and/or fraudulent acts, Defendant reaped and continues to reap unfair benefits and illegal profits at the expense of Plaintiffs and the California class members.  Defendant should be enjoined from this activity and made to disgorge these ill-gotten gains pursuant to Business and Professions Code § 17203.

228.    Accordingly, Plaintiffs and the class members respectfully request that the Court award judgment and relief in their favor to provide restitution with interest and other equitable relief.

### PRAYER FOR RELIEF ON CLASS, COLLECTIVE ACTION, AND INDIVIDUAL CLAIMS

229.    WHEREFORE, the Class Representatives, on their own behalf and on behalf of the Classes, as defined above, pray that this Court:

49

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1  A.  Certify this case as a class action maintainable under Federal Rules of
2  Civil Procedure Rule 23 (a), (b)(2) and/or (b)(3) on behalf of the proposed Plaintiff
3  Classes; designate the proposed Class Representatives as representatives of these Classes;
4  and designate Plaintiffs' counsel of record as Class Counsel;

5  B.  Designate this action as a collective action on behalf of the proposed EPA
6  Collective Action Plaintiffs and

7  (i) promptly issue notice pursuant to 29 U.S.C. § 216(b) to all similarly-situated
8  members of the EPA Collective Action Opt-In Class, which (a) apprises them of the
9  pendency of this action, and (b) permits them to assert timely EPA claims in this action
10  by filing individual Consent to Join forms pursuant to 29 U.S.C. § 216(b); and

11  (ii) toll the statute of limitations on the claims of all members of the EPA
12  Collective Action Opt-In Class from the date the original complaint was filed until the
13  Class members are provided with reasonable notice of the pendency of this action and a
14  fair opportunity to exercise their right to opt-in as Plaintiffs;

15  C.  Declare and adjudge Daiichi Sankyo's employment policies, practices
16  and/or procedures challenged herein are illegal and in violation of the rights of Class
17  Representatives and Class members;

18  D.  Issue a permanent injunction against Daiichi Sankyo, Inc. and its partners,
19  officers, owners, agents, successors, employees, and/or representatives, and any and all
20  persons acting in concert with them, enjoining them from engaging in any further
21  unlawful practices, policies, customs, usages, gender/pregnancy discrimination, and
22  retaliation as set forth herein;

23  E.  Order Defendant to initiate and implement programs that will: (i) provide
24  equal employment opportunities for female employees; (ii) remedy the effects of
25  Defendant's past and present unlawful employment policies, practices, and/or
26  procedures; and (iii) eliminate the continuing effects of the discriminatory and retaliatory
27  practices described above;

28  //

50

1       F.     Order Defendant to initiate and implement systems of assigning, training,

2 transferring, compensating, and promoting female employees in a non-discriminatory

3 manner;

4       G.     Order Defendant to establish a task force on equality and fairness to

5 determine the effectiveness of the programs described in E and F above, which would

6 provide for: (i) monitoring, reporting, and retaining of jurisdiction to ensure equal

7 employment opportunity; (ii) the assurance that injunctive relief is properly implemented;

8 and (iii) a quarterly report setting forth information relevant to the determination of the

9 effectiveness of the programs described in E and F above;

10       H.     Order Defendant to adjust the wage rates and benefits for the Class

11 Representatives and the Class members to the level that they would be enjoying but for

12 the Defendant's discriminatory policies, practices, and/or procedures;

13       I.     Order Defendant to place, reinstate, or restore the Class Representatives

14 and the Class members into those jobs they would now be occupying but for Defendant's

15 discriminatory policies, practices, and/or procedures;

16       J.     Order that this Court retain jurisdiction of this action until such time as

17 the Court is satisfied that the Defendant has remedied the practices complained of herein

18 and is determined to be in full compliance with the law;

19       K.     Award nominal, compensatory, and punitive damages to the Class

20 Representatives and the Class members, in excess of one hundred million dollars;

21       L.     Award litigation costs and expenses, including, but not limited to,

22 reasonable attorneys' fees, to the Class Representatives and Class members;

23       M.     Award back pay, front pay, lost benefits, preferential rights to jobs, and

24 other damages for lost compensation and job benefits with pre-judgment and post-

25 judgment interest suffered by the Class Representatives and the Class members to be

26 determined at trial;

27       N.     Order Defendant to make whole the Class Representatives and Class

28 members by providing them with appropriate lost earnings and benefits, and other

51

Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT

1  affirmative relief;

2    O.    Award any other appropriate equitable relief to the Class Representatives

3  and Class members; and

4    P.    Award any additional and further relief as this Court may deem just and

5  proper.

6

### JURY DEMAND

7

8    Plaintiffs demand a trial by jury on all issues triable of right by jury.

9

10  Dated: _____**2/11/2013**_____

11

12                                          Respectfully Submitted,

13

14                                          _____
                                            Janette Wipper (SBN 275264)
15                                          Felicia Medina (SBN 255804)
                                            **SANFORD HEISLER, LLP**
16                                          555 Montgomery Street, Suite 1206
                                            San Francisco, CA 94111
17                                          (415) 795-2020 (main)
                                            (415) 795-2021(fax)
18                                          jwipper@sanfordheisler.com
                                            fmedina@sanfordheisler.com
19

20                                          ***Attorneys for the Plaintiffs and the Class***

21

22

23

24

25

26

27

28

                                                                                    52
Case No. _____ -- CLASS AND COLLECTIVE ACTION COMPLAINT